LOURIE, Circuit Judge,
dissenting.
I respectfully dissent from the majority’s conclusion that the statute of limitations had not run because the harm caused by aquatic growth did not stabilize until after December 1994. I do so because orn-ease law holds that it is the act of the government that triggers the clock, not the time when the consequences of that act are fully felt. In my opinion, the Court of Federal Claims was correct in holding that the Commission “knew or should have known that raising the pool level would, in a short, fixed, period of time, result in a permanent taking of Black Lake due to uncontrolled aquatic growth,” and therefore the Commission’s claim was barred by the statute of limitations. Final Decision, slip op. at 19. Contrary to the majority’s view that there was no act creating the hydrilla weed problem until January 1997, the government’s impoundment of Pool 3 in December 1994 was the act that created the weed infestation, regardless when the consequences of that decision were felt. Because the government’s act occurred more than six years before the Commission first filed suit in July 2001, the claim was barred by the statute of limitations, 28 U.S.C. § 2501.
The majority opinion sets forth the relevant case law concerning the “stabilization” doctrine, concluding that “[bjecause the harm manifested itself only gradually after 1993, and the nature and extent of harm was not clear in 1993, the accrual date of the taking was later than December 1994.” In my view, that approach applies the “stabilization” doctrine of United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) too broadly. The Supreme Court has held that Dickinson stands for the limited holding that the statute of limitations does not bar an action for a taking by flooding “when it was uncertain at what stage in the flooding operation the land had become appropriated to public use.” United States v. Dow, 357 U.S. 17, 27, 78 S.Ct. 1039, 2 L.Ed.2d *1293 1109 (1958). The Court of Claims and this court have adopted a similarly narrow interpretation of Dickinson and the meaning of “stabilization” in the takings context. We explained in Fallini v. United States, 56 F.3d 1378 (Fed.Cir.1995) that “the Supreme Court [has] ‘more or less limited [.Dickinson ] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking.’ ” Id. at 1381-82 (quoting Kabua v. United States, 212 Ct.Cl. 160, 546 F.2d 381, 384 (1976)).
Our case law thus holds that “the ‘obligation to sue’ arises once the ‘permanent nature’ of the government action is evident, regardless of whether damages are ‘complete and fully calculable.’ ” Goodrich v. United States, 434 F.3d 1329 (Fed.Cir.2006) (citations omitted); see Boling v. United States, 220 F.3d 1365, 1371 (Fed.Cir.2000) (“The contention that Dickinson stands for the proposition that the filing of a lawsuit can be postponed until the full extent of the damage is known has been soundly rejected.”); Fallini 56 F.3d at 1382 (“[I]t is not necessary that damages from the alleged taking be complete and fully calculable before the cause of action accrues.”); see also Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (holding that the proper focus in a claim accrual analysis “is upon the time of the [defendant’s] acts, not upon the time at which the consequences of the acts become most painful.”).
I believe that this case is unlike Dickinson and the other flooding cases because the Commission’s claim is not based on a gradual taking resulting from continuing flooding, but rather on gradual harm caused by a singular discrete act: the taking of the right to drain water from Black/ Clear Lake into Red River. Notwithstanding the majority’s recitation of the facts, the permanent nature of the taking was nonetheless evident to the Commission when the government raised the level of Pool 3 to 95 feet M.S.L. in December 1994, and thus the takings claim accrued at that time.
Far from being “unquantifiable and speculative,” as the majority contends, ante at 1291, the aquatic growth problem caused by the existing hydrilla was an inevitable consequence of the government’s act that was known to the Commission in December 1994. As early as 1988, the State of Louisiana Department of Transportation and Development (“State”), which the Commission has accepted as its “alter ego,” made repeated contentions that raising the water level of Pool 3 would interfere with its ability to control aquatic growth in Black Lake. In 1992, the State took an additional step of calculating the cost of controlling aquatic weed growth resulting from the government’s impoundment of Pool 3 to be $7,575,000 over the lifetime of the project, stating that “[t]his amount would be acceptable to the Department for mitigation of losses,” and requesting corrective action. Clearly, the Commission thought the harm was sufficiently stabilized in 1992 to propose a settlement that would have made it whole. In response, the government notified the Commission that it had no intention of altering its plan to raise the pool level to 95 feet M.S.L. However, even though the Commission knew of the harmful effects of raising Pool 3, the Commission waited until the consequences of the government’s act were “most painful” before taking action. Fallini 56 F.3d at 1383. That decision cannot change the accrual date of the statute of limitations.
The majority states that “[t]hough hy-drilla had been discovered in 1993, it was believed killed by a drawdown in May of
*1294 1994. It was rediscovered again sometime in 1995, but it was not until 1996 that detailed studies showed it was spreading to an extent that it had become a problem.” Ante at 1287. However, contrary to the majority’s view that the hydrilla seriously emerged for the first time in 1996, the Commission has conceded that the hydrilla problem returned when the government impounded Pool 3 in December 1994. The Commission’s counsel represented to the trial court that, “in 1994, prior to raising the pool level to 95 feet M.S.L., the [Commission] was able to draw down Black/Clear Lake to address a problem with hydrilla, but that problem returned once the pool was elevated in December 1994 and the plaintiff could no longer draw down the Lake.” Final Decision, slip op. at 7.
Because any uncertainty in December 1994 concerned the ultimate extent of the weed damage, not the permanent nature of the taking, I conclude that the government’s act of impounding Pool 3 was sufficient to constitute a taking and hence accrue a takings claim. Accordingly, I respectfully dissent from the court’s application of the stabilization doctrine to permit the Commission to litigate a claim that accrued more than six years before it filed suit in the Court of Federal Claims. I therefore would affirm the judgment of that court.